# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CARA-LYNNE SCHENGRUND,** | : | |
| **JOANNA FLOROS, KATHRYN** | : | |
| **LANOUE, CAROL WHITFIELD,** | : | |
| **JUDITH WEISZ, MARGARET** | : | |
| **GOLDMAN, PATRICIA S. GRIGSON,** | : | |
| **and KATHLEEN M. MULDER,** | : | |
|     **Plaintiffs** | : | **Civil Action No. 4:07-CV-718** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **THE PENNSYLVANIA STATE** | : | |
| **UNIVERSITY, and PENN STATE** | : | |
| **COLLEGE OF MEDICINE, a/k/a PENN** | : | |
| **STATE MILTON S. HERSHEY** | : | |
| **MEDICAL CENTER COLLEGE** | : | |
| **OF MEDICINE, HAROLD L. PAZ,** | : | |
| **DARRELL G. KIRCH, WAYNE ZOLKO,** | : | |
| **ROBERT C. ABER, LEONARD S.** | : | |
| **JEFFERSON, KENT VRANA, and** | : | |
| **JAY MOSKOWITZ,** | : | |
|     **Defendants** | : | |

## <u>MEMORANDUM</u>

Before the Court is Defendants' motion for partial summary judgment brought pursuant to Federal Rule of Civil Procedure 56(c). (Doc. No. 29.) The motion, addressed solely to the issue of the statute of limitations, has been fully briefed and is ripe before the Court for disposition. For the reasons that follow, the motion will be granted in part and denied in part.

## I.    BACKGROUND

Plaintiffs Cara-Lynne Schengrund, Joanna Floros, Kathryn Lanoue, Carol Whitfield, Judith Weisz, Margaret Goldman,[1] Patricia S. Grigson, and Kathleen Mulder are female professors ("Professors") at the Penn State College of Medicine, also known as the Penn State

---

[1]Plaintiff Goldman is no longer currently employed at COM, but was employed as a faculty member from 1985 through June 2004.

Hershey Medical Center College of Medicine ("COM"), a division of the Pennsylvania State University ("PSU" or "the University"). (Doc. No. 31, at 2-4.) PSU Professors are paid a base salary, which is reviewed annually and augmented pursuant to a University-wide salary increase percentage established by the PSU President. (Doc. No. 31 ¶¶ 30-34.) An individual professor's base salary then may be potentially increased by a "research incentive," an additional amount based on the level of external grant funding obtained by the faculty member under review. (Id. ¶ 36.)

**Faculty Senate Salary Studies**

Over the years, multiple reports and analyses have been undertaken to address salary disparity and compensation at PSU and COM. In the years 1984, 1997-99, 2001, and 2003, the PSU Faculty Senate conducted salary reports to which all professors at PSU had access. (Doc. No. 31, at 8-13.) The 1984 study noted a gender-based disparity in salary of between $500 and $1,000, but COM faculty was not included in the study. (Id. ¶¶ 43-44.) The 1997 study, however, did include COM faculty. It observed "no significant differences" in salary by gender throughout the University "with the exception of Hershey [COM] where male faculty appeared to have notably higher salaries" even when time in rank is considered. (Id. ¶¶ 47-48.) In 1998, the Faculty Senate released a COM addendum to their 1997 report confirming the finding that there was an unexplainable difference in salaries between men and women at COM. (Id. ¶ 51.) The study did not use regression analysis or account for different salaries by specialty, and the Faculty Senate stated that it was unable to further explain the salary differential due to the University's policy of maintaining confidential salary information. (Doc. No. 36 ¶¶ 50-51.) In 1999, the Faculty Senate released another salary report, which again recognized a salary differential between male and

female professors at COM that could not be fully explained by differences in years in rank. (Doc. No. 31 ¶ 57.) The report also cautioned that the mean and standard deviation put forth therein did "not provide a complete picture of faculty salary data." (Doc. No. 36 ¶ 57.) The Faculty Senate released additional faculty salary studies in 2001 and 2003. Those studies analyzed mean and median salary data but did not delineate data on the basis of gender. (Doc. No. 31 ¶¶ 59, 61; Doc. No. 36 ¶¶ 59, 62.) In 2000, the University's Affirmative Action Office ("AAO") studied faculty salaries, and in a report entitled "College of Medicine Basic Science Departments Salary Analyses," stated that "sex is not a significant factor in explaining salary in this population and there is no indication of systemic bias on the basis of sex." (Doc. No. 31 ¶ 90.)

**The Women's Faculty Group**

In 1999 or 2000, Dr. Joan Summy-Long formed the Women's Faculty Group[2] ("WFG") to address the specific concerns of female faculty at COM. (Doc. No. 31 ¶ 72.) All female faculty were occasionally notified of WFG meetings and invited to participate; all Plaintiffs did participate in the group at some point, but to differing degrees. (Id. ¶ 73.) Notably, Dr. Kathleen Mulder did not participate in the group until 2006. (Id. ¶ 75.)

As early as 2000, WFG identified salary inequity as a concern to address. (Id. ¶¶ 77-83.) WFG discussed the disparate salary compensation issue at a meeting with COM Dean Darrell Kirch in August of 2000 and again with Vice Dean for Faculty and Administrative Affairs Kevin Grigsby in October of 2000. (Id. ¶¶ 80-83.) In a January 2001 memorandum addressed to Vice Dean Grigsby, WFG questioned the results of the 2000 AAO study that had found sex was not a

---

[2]The group was, at times, know by other names, *e.g.*, Women in Science and Medicine and Women Faculty in Science and Medicine, but the Court will consistently refer to the group as the Women's Faculty Group ("WFG") for purposes of this memorandum.

factor in COM salary determinations. (Id. ¶ 93.) In that correspondence, WFG based its challenge to the AAO study on knowledge that studies previously conducted by the Faculty Senate had shown a gender bias to exist. (Id.) Shortly thereafter, in March of 2001, Wayne Zolko, COM Controller, presented mean and median salary figures for all COM scientists, categorized by the rank of Professor, Associate Professor, and Assistant Professor. (Id. ¶ 96, 98.) At the conclusion of the presentation, Plaintiff LaNoue prepared a chart of the median and mean salaries reported by Zolko and asked each female faculty member to mark where her salary fell in comparison to the mean and median data. (Id. ¶¶ 98-100.) Twenty of the twenty-two female faculty members who identified their salary on LaNoue's graph had a salary below the mean and median figures provided by Zolko. (Id. ¶ 103.) Chart in hand, WFG contacted the AAO office to determine whether the numbers used to produce the 2000 study were accurate. (Id. ¶ 105.) The AAO discovered that their study had used salary data that included research incentives and other salary supplements rather than solely base salary figures. (Id. ¶ 110.)

Following this discovery, on July 11, 2001, WFG sent a letter to Dean Kirch requesting that an independent consultant be hired to conduct a regression analysis of COM salaries on the basis that "the problem of gender inequity has not been addressed satisfactorily," despite over "ten years" of indications of gender-based salary inequity demonstrated by Faculty Senate reports. (Id. ¶¶ 115, 116.) The letter was individually signed by Plaintiffs Schengrund, Floros, LaNoue, Whitfield, Weisz, and Goldman. (Id. ¶ 118.) Plaintiff Grigson admitted knowledge of the letter and its contents at the time it was sent. (Id. ¶¶ 119.) Plaintiff Mulder was not aware of and did not participate in the production of this letter, though she did become aware at some point that WFG sought an external salary analysis. (Doc. No. 32-4 at 78-85.)

PSU did not immediately accept WFG's suggestion to hire an independent consultant. Instead, the Office of Human Resources ("OHR") initiated a follow-up study to the AAO study, which analyzed COM faculty salaries using only base salary data. (Doc. No. 31 ¶ 124.) The preliminary findings of the OHR report, which demonstrated that female basic scientists at COM were paid less than male basic scientists, were reported to COM administration in September of 2001. (Id. ¶¶ 124-25). Instead of completing the OHR study, COM determined that it should accept WFG's suggestion to commission an independent salary study; the University retained Haignere, Inc. ("Haignere") to conduct the study in January of 2002. The preliminary results of the OHR study were not disclosed to WFG or other faculty members. (Doc. No. 36 ¶ 125.)

**Haignere Report**

Haignere conducted a multiple regression analysis of the 2001-02 academic year base salaries at COM to determine whether salary disparities existed by gender or race. (Doc. No. 36 ¶¶ 131-32, 137.) On October 14, 2003, Haignere presented the preliminary findings to WFG, Dean Kirch, and Dr. Grigsby: Haignere found that a class-based salary disparity with respect to gender existed at COM. (Doc. No. 31 ¶ 141.) At the meeting, Dean Kirch expressed his intent to take corrective action in the form of class-based adjustments once further analysis had been completed to determine the magnitude of the problem. (Id. ¶¶ 144-47.) Haignere completed her report of COM salary equity in June of 2004. (Id. ¶ 168.) At the time Haignere's final report was released, COM administration represented that a longevity correction would be made to compensate for past pay disparity. (Doc. No. 36 ¶ 155.) In September of 2004, WFG learned that all white female basic scientists would receive a 3.8% salary adjustment retroactive to July 1, 2004, but that no other longevity correction would be made. (Doc. No. 31 ¶ 173; Doc. No. 36

¶ 155.)

**Procedural History**

On April 19, 2005, Plaintiffs filed charges with the EEOC against PSU alleging sex discrimination in pay dating back to 1997 or earlier. (Doc. No. 31 ¶¶ 177-78.) This action was filed on April 23, 2007, with an amended complaint filed June 25, 2007. By Court order, discovery has been limited to the timeliness issue, which is now before the Court on summary judgment. In this motion for partial summary judgment, Defendants argue that Plaintiffs make allegations and seek recovery for actions which are barred by the statute of limitations. Specifically, Defendants allege that Plaintiffs should not be able to recover for events occurring prior to: June 18, 2004 for the Title VII claims, October 14, 2004 for the PHRA claims, April 23, 2005 for the Title IX, § 1983, § 1985, and PERA claims; and April 23, 2004 for the EPA claims. Since the filing of this motion, the Lilly Ledbetter Fair Pay Act has become law, prompting the Court to order supplemental briefing regarding the impact of that statute on this case. (Doc. No. 72.) Briefing has now been completed and the issue is ripe before the Court for disposition.

II.      **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(c) provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute is material if it might affect the outcome of the suit under the applicable law, and it is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986). At summary judgment, the inquiry is whether

the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law. Id. at 251-52. In making this determination, the Court must "consider all evidence in the light most favorable to the party opposing the motion." A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a court should grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, or speculative. Anderson, 477 U.S. at 249-50. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

## III.    DISCUSSION

In this motion for partial summary judgment, Defendants seek a determination that the

statutes of limitations attached to the laws at issue (Title VII, Title IX, EPA, § 1983, § 1985, PHRA, and PERA) foreclose Plaintiffs' recovery for events occurring prior to 2004 despite the fact some of Plaintiffs' allegations date back to the 1970s. Plaintiffs respond that the respective statutes of limitations do not prelude their claims because the Fair Pay Act, the discovery rule, and equitable tolling apply. Each statute under which Plaintiffs bring their claims has its own distinct statute of limitations and triggering criteria, therefore the Court will proceed statute by statute.

A.    **Title VII**

Title VII aims to prevent employers from discriminating against employees on the basis of sex, as well as race, color, religion, and national origin. 42 U.S.C. § 2000e-2 *et seq*. To further this goal, Congress created a remedial scheme by which an aggrieved party must file a complaint with the state anti-discrimination agency (if there is one, as there is in Pennsylvania), followed by a requirement that the individual also file a claim with the EEOC within 300 days of the allegedly discriminatory action. 42 U.S.C. §§ 2000e-5(b) through 5(e); West v. Philadelphia Elec. Co., 45 F.3d 744, 754 n.8 (3d Cir 1995) ("The 300-day period applies where the plaintiff has initially instituted proceedings with a State or local agency. Otherwise, the applicable period is 180 days."); Serendiski v. Clifton Precision Prods. Co., 776 F.2d 56, 63 (3d Cir. 1985). Only after those steps have been completed may an individual file suit in federal court. West, 45 F.3d at 754 ("This filing is a prerequisite to a civil suit under Title VII."). It is undisputed that Plaintiffs in this case filed a gender discrimination claim with the EEOC on April 19, 2005. Applying the 300-day statute of limitations period, the terms of the statute allow Plaintiffs to recover for discriminatory conduct occurring on or after June 14, 2004. The question before the

Court, then, is what discriminatory conduct occurred, or is deemed to have occurred, on or after June 14, 2004.

### 1.    Application of the Fair Pay Act

Both parties agree that the recently enacted Lilly Ledbetter Fair Pay Act ("FPA" or "Act") applies to this case.[3] The FPA was enacted to overturn the Supreme Court ruling in <u>Ledbetter v. Goodyear Tire & Rubber Co.</u>, 550 U.S. 618 (2007). <u>See</u> Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2 , § 2(1)-(2), 123 Stat. 5 (2009) ("Congress finds the following: (1) The Supreme Court in <u>Ledbetter</u> significantly impairs statutory protections against discrimination in compensation that Congress established and that have been bedrock principles of American law for decades." (Internal citation omitted)); <u>Mikula v. Allegheny County of Pa.</u>, No. 07-4023 at 7 (3d Cir. Sept. 10, 2009) ("[The Fair Pay Act's] purpose was to reinstate the law regarding the timeliness of pay compensation claims as it was prior to the <u>Ledbetter</u> decision."). Specifically, the Act amends Title VII to state, in pertinent part:

> (3)(A) For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including <u>each time wages, benefits, or other compensation is paid</u>, resulting in whole or in part from such a decision or other practice.

<u>Id.</u> at § 3 (emphasis added). Simply put, the FPA deems each paycheck issued pursuant to a discriminatory pay structure an independent, actionable employment practice under Title VII.[4]

---

[3]By the terms of the Act, it applies to all cases pending on or after May 28, 2007. Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2 , § 6, 123 Stat. 5 (2009).

[4]The Act also amended the Americans with Disabilities Act, the Rehabilitation Act, and the Age Discrimination in Employment Act. Lilly Ledbetter Fair Pay Act of 2009 Pub. L. No. 111-2.

The Act also explicitly provides for "recovery of back pay for up to two years preceding the filing of the charge . . . ." Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, § 3 123 Stat. 5 (2009).

Accordingly, if Plaintiffs demonstrate that their wages were the result of a discriminatory decision to pay them less money than their male coworkers, they may recover for each and every paycheck received from the present dating back to 300 days prior to the filing of their action with the EEOC (June 18, 2004), and they do not need to show that the discriminatory decision to pay them less occurred within this period. Additionally, they may recover back pay for up to two years prior to the earliest pay check received within this period.

## 2. Application of the Discovery Rule and Equitable Tolling

The determination that each paycheck is independently recoverable does not end the analysis, however, because Plaintiffs seek recovery for more than just the paychecks received during the statute of limitations period. Plaintiffs' suggested application of the discovery rule and equitable tolling effectively tolls the accrual date for all paychecks received prior to June 18, 2004, so that they are deemed to have accrued within the limitations period. Defendants allow that the doctrines of the discovery rule and equitable tolling apply to pay discrimination claims but deny that they have the effect, in this case, of allowing Plaintiffs to recover for paychecks received prior to the statutory limitations period. The Court turns now to whether, upon application of the discovery rule and equitable tolling, Plaintiffs can recover for paychecks received prior to June 18, 2004.

### i. Discovery Rule

The purpose of the discovery rule is "to postpone the beginning of the statutory

limitations period from the date when the alleged unlawful employment practice occurred, to the date when the plaintiff actually discovered he or she had been injured." Oshiver v. Fishbin, Sedran, & Berman, 38 F.3d 1380, 1386 (3d Cir. 1993) (discussing the doctrines of the discovery rule and equitable tolling in the context of Title VII sex discrimination claim). The discovery rule provides that the statute of limitations for filing the initial complaint in a pay claim does not begin to run until the plaintiff knew or should have known about the alleged discriminatory act. Miller v. Beneficial Mgmt. Corp., 977 F.2d 834 (3d Cir. 1992) (overruling district court's grant of summary judgment because questions of material fact existed as to whether plaintiff could have known about a pay disparity before learning similarly situated male employee's salary); Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1420 (3d Cir. 1991) (foregoing announcement of a "bright line guide to the limitations problem," and holding that knowledge of an unfavorable performance evaluation does not start the statute of limitations clock because such knowledge, alone, is insufficient knowledge of an adverse employment action). "The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury," not the date she knew the injury was legally cognizable. Oshiver, 38 F.3d at 1390; Podobnik v. United States Postal Serv., 409 F.3d 584, 590 (3d Cir. 2005) ("[T]he discovery rule is concerned with knowledge of *actual* injury, not legal injury.").

        In this case, Plaintiffs allege discrimination in pay. Unlike many discrimination claims, where the adverse employment action is manifestly an injury, *e.g.* termination, demotion, or harassment, receipt of a paycheck is not, in itself, an injury. See generally, Ledbetter, 550 U.S. at 649 (contrasting overt injuries such as promotions, transfers, hiring, and firings with the hidden injury of compensation disparity) (Ginsburg, J., dissenting). Rather, as the unfavorable

employment evaluation in <u>Colgan</u> was not termed an injury until it resulted in termination, the receipt of a paycheck does not become an injury until the employee knows that the amount in the paycheck is artificially low due to discrimination. <u>Colgan</u>, 935 F.2d at 1418 (finding that it was the moment of termination, rather than notice of an unfavorable performance evaluation which led to the termination, that triggered the statute of limitations period because "an alleged unlawful employment practice . . . must have inflicted harm which was or should have been noticed, or it will not have triggered the limitations period."). Thus, while the FPA ensures that receipt of each paycheck constitutes an independent act of discrimination under Title VII, an employee does not know of her injury until she knows that the amount of the check is lower than it would be if she were male. The important question for accrual purposes, then, is when did Plaintiffs know, or when should they have known through the exercise of reasonable diligence, that they were underpaid because they are women.

Defendants argue that Plaintiffs were on notice of their pay discrimination claims by July 2001 at the very latest. The Court agrees.[1] In January of 2001, WFG members became aware of an AAO study indicating that there was *no* evidence of systemic gender bias at COM. (Doc. No. 31 ¶ 91.) In response to this information, WFG sent a letter to Dr. Grigsby challenging the results of the AAO study, and affirming familiarity with prior studies done by the Faculty Senate that found gender bias. (<u>Id.</u> ¶ 93.) Thus, by January 25, 2001, Plaintiffs, with the exception of Dr. Mulder, were on notice of studies done which, while incomplete, indicated the likelihood of

---

[1]While particular Plaintiffs may have demonstrated knowledge of discrimination prior to 2001, by filing claims with the affirmative action office, for example, an individualized assessment of the particular date of each Plaintiff's knowledge is unnecessary because, as will be demonstrated, *infra*, Part A(2)(ii), even an accrual date of 2001 is insufficient to bring these past claims under the umbrella of the current action.

gender bias in salary determinations at COM.[2]

On March 20, 2001, Mr. Zolko held a faculty meeting during which he presented the mean and median salary data for COM professors organized by rank. (Id. ¶ 98.) Upon completion of the presentation, Dr. LaNoue recorded the mean and median salary data, and asked twenty-two female faculty members to each mark where her salary fell in relation to the mean and median on the chart. (Id. ¶ 100.) The results of Dr. LaNoue's chart were astounding---twenty of the twenty-two female faculty members' salaries were below the mean and median figures. (Id. ¶ 103.) WFG presented Dr. LaNoue's chart to the administrators of the AAO study, and it was discovered that the AAO study inaccurately represented faculty members' base salaries, thereby making the results inaccurate. (Id. ¶ 110.) WFG pressed for a new, more accurate study to be completed. On July 11, 2001, WFG sent a letter to Dean Kirch requesting that a study be performed by an external consultant because, despite the passage of ten years since the first Faculty Senate report indicated the possibility of gender bias, "the problem of gender inequity ha[d] not been addressed satisfactorily."[3] (Id. ¶ 116.)

Thus, with the exception of Plaintiff Mulder, by July 11, 2001, Plaintiffs had all 1) demonstrated knowledge of prior studies indicating a likelihood of gender bias at COM, 2) seen their own salary in comparison to mean and median salary data for professors of their rank, 3) learned that the only study suggesting that COM salaries were *not* affected by gender used flawed data, and 4) asserted their belief to an administrator that gender inequity at COM existed but "has

---

[2]Because Plaintiff Mulder was not a member of WFG at this time and alleges additional facets of discrimination, her status will be discussed separately.

[3]This letter was signed by all Plaintiffs except Plaintiffs Mulder and Grigson. Plaintiff Grigson admits knowledge of the letter at the time it was sent; Professor Mulder does not. (Doc. No. 31 ¶¶ 118-19.)

not been addressed satisfactorily." There is no evidence to the contrary. A reasonable fact-finder given the above undisputed facts could only conclude that Plaintiffs knew or should have known of the existence of pay discrimination at this time.

Although parodoxical, Plaintiffs, professors of science–trained to make conclusions only upon concrete, statistical evidence–are charged with knowledge of an injury before verifiable evidence of gender-based salary discrimination was presented to them. Yet, the law is clear that waiting for hard and fast proof is not required, or even allowed, for a plaintiff to file a claim in the employment discrimination context.[4] Instead, the law requires a plaintiff to file suit upon the touch of an injury and the suspicion of discrimination. Consequently, while Plaintiffs may not have had concrete, statistical proof of the existence of gender discrimination until the final Haignere report was published in June of 2004, the informal findings asserted by Plaintiffs on or before July 11, 2001 at the latest were sufficient to put the Professors on notice of their claim.

It is notable that Dr. Mulder did not participate in making Dr. LaNoue's chart in 2001, sign the letter to Dean Kirch demonstrating an awareness of past studies indicating gender bias, profess awareness of the AAO study and the earlier studies conducted by the Faculty Senate, or participate in WFG and Faculty Organization meetings. (Doc. No. 32-4 at 80.) Looking at these facts in the light most favorable to Dr. Mulder, the Court takes as true that she did not know her salary was affected by gender until she received a letter indicating that fact in September of 2004. (Doc. No. 32-4 at 80-87.) Nonetheless, the standard is not whether she actually knew about the existence of an injury, but whether, with the exercise of reasonable diligence she should have

---

[4] Completion of the Haignere report required a year and a half, while the statute of limitations allows only 300 days to file suit.

known. Podobnik, 409 F.3d at 590 (accrual date is knowledge of actual injury, not legal injury).

Unlike the other Plaintiffs, Dr. Mulder's claims of sex discrimination extend beyond her unequal pay claim. She alleges that she was discriminated against in lab space assignments and suffered harassment as a result of her sex. (Doc. No. 32-4 at 101.) Applying the discovery rule to this claim, the record indicates that she had knowledge of the inadequate lab space on or about November 19, 2003. (Doc. No. 32-5 at 13.) She also mediated the harassment issue in 1999 or 2000, though at the time she did not know the harassment was inflicted because of her sex. (Doc. No. 32-5 at 3, 10-12.) Because knowledge that she had less lab space than others with her level of grant support and knowledge that she was being harassed both constitute knowledge of the actual injury, those claims accrued in November of 2003 and 2000, respectively. These accrual dates are clearly outside the statute of limitations period and Plaintiff Mulder makes no arguments in support of equitable tolling on these claims. Accordingly, they are untimely.

Regarding the pay discrimination allegations, the facts indicate that Dr. Mulder had contact with Plaintiffs and knew of their concerns about gender bias at COM. She stated that "Joan Summy-Long often came to me about problems and issues and tried to get me to go to meetings. . . . [W]omen in other departments made comments about their situation and said that I had similar issues and I should be part of that group," but that she ignored information from both Faculty Organization meetings and WFG meetings, sending such notifications directly to her spam filter, because she "didn't feel [she] needed to go to a meeting." (Doc. No. 32-4 at 81-85.) A reasonably diligent Plaintiff, while not obligated to actively debate and seek out information with the diligence WFG members demonstrated throughout this process, is charged with listening to information told to her on multiple occasions. She cannot simply ignore the facts of

discrimination being uncovered around her and thereby receive benefits in court above and beyond those of the women who actively sought to remedy discrimination in the workplace for both her benefit and their own. With reasonable diligence, Plaintiff Mulder would also have known of the existence of pay discrimination in 2001.

Therefore, the Court finds that the discovery rule yields an accrual date of July 11, 2001, at the latest, for all Plaintiffs. This 2001 date does not fall within 300 days prior to Plaintiffs' filing with the EEOC, and thus Plaintiffs still cannot recover for paychecks received before June 18, 2004 unless the Court also finds that equitable tolling applies to extend the statute of limitations period for these three years.

### ii.     Equitable Tolling

Equitable tolling "steps in to stop" the statute of limitations clock once accrual has occurred when the plaintiff does not have sufficient knowledge of the facts supporting her cause of action due to one of three limited circumstances: "(1) where the defendant has actively misled the plaintiff respecting the plaintiff's cause of action; (2) where the plaintiff in some extraordinary way has been prevented from asserting his or her rights; or (3) where the plaintiff has timely asserted his or her rights mistakenly in the wrong forum." Id. at 1386, 1390; Meyer v. Riegel Prods. Corp., 720 F.2d 303 (3d Cir. 1983). For the defendant to have actively misled the plaintiff respecting her cause of action, "the employer's own acts or omissions [must] have lulled the plaintiff into foregoing prompt attempts to vindicate his rights," but need not be "egregious acts of active deception." Miller, 977 F.3d at 845 (3d Cir. 1992) (citing Meyer v. Riegel Prods. Corp., 720 F.2d 303, 307 (3d Cir. 1983)). Equitable tolling is to be used rarely and only in cases where a plaintiff can show both that "(1) the defendant actively misled the plaintiff . . . *and* (2)

this deception *caused* the plaintiff's non-compliance with the limitations provision." Ruehl v. Viacom, Inc., 500 F.3d 375, 384 (3d Cir. 2007) (quoting Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1387 (3d Cir. 1994)). The plaintiff has the burden of establishing that the equitable tolling doctrine applies. Prodobnik, 409 F.3d at 591. The rule is founded upon the fundamental notion of equity: that a party should not be allowed to profit from its own wrongdoing. Oshiver, 38 F.3d at 1388. Moreover, equitable tolling is not an excuse for ignorance; it instead can only be applied upon a plaintiff's showing that "she could not, by the exercise of reasonable diligence, have discovered the essential information bearing on [] her claim." Ruehl, 500 F.3d at 384 (quoting In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir. 2004)).

From the accrual point of July 11, 2001, the only alleged actions on the part of the University that might prompt equitable tolling are the administrators' statements that longevity corrections would be made. (Doc. No. 36 ¶ 55.) Upon initially hearing the results of Dr. Haignere's study on October 23, 2003, Dean Kirch stated that "he was persuaded that a class-based salary disparity existed and that he intended to take corrective action." (Doc. No. 31 ¶ 145.) While "corrective action" might imply a retroactive salary adjustment to some, Dean Kirch and Dr. Grigsby clarified in a WFG meeting on November 20, 2003, that they had "no expectation of making retroactive salary adjustments." (Doc. No. 31 ¶ 155; Doc. No. 36 ¶ 155.) Therefore, this October statement, even if deemed to provide one month of equitable tolling, has

no effect on the litigation because a thirty-day tolling period for paychecks received in October 2003 does not suffice to bring them within the limitations period.[5]

On June 23, 2004, at the presentation of Haignere's final results, Dean Kirch allegedly proposed a longevity correction to remedy the salary disparity revealed by Haignere's study. (Doc. No. 36 ¶ 55.) By September of 2004 at the latest, however, it was clarified that a longevity correction would not be made. (Doc. No. 36 ¶ 55.) A reasonable fact-finder could conclude that a promise to make a longevity correction might encourage Plaintiffs to forego filing a lawsuit. Plaintiffs had no way to determine the administrations' plans to take corrective action other than to rely on the statements of administrators. The misleading statement as to the nature of the remedy the University would provide was not a legal misrepresentation as to the validity of a prospective suit, but rather, an alleged misstatement that the Professors may well have relied upon in abstaining from filing suit immediately upon receipt of the Haignere data. Thus the promises of a longevity correction are analogous to the employer's statements in Miller and Meyer telling those plaintiffs they were fired for reasons other than discrimination, and are sufficient to invoke equitable tolling. Miller, 977 F.2d at 834 (employer's repeated assurances that her compensation was at the level she deserved and that she would receive a raise in the future supported equitable tolling); Meyer, 720 F.2d at 308 (allowing equitable tolling in ADEA

---

[5]Nor would it suffice to bring a paycheck within the limitations period of any other statute at issue in this case. Accordingly, the Court has no need to determine whether such statement would actually qualify for equitable tolling. Similarly, Plaintiffs' assertions that equitable tolling should apply for the period during which Defendants told them they were conducting a second salary study but concealed the unfavorable initial results from WFG, do not merit full consideration because, even if equitable tolling were applied, the statute of limitations would be tolled for only the period during which WFG was under the impression an internal salary study was being conducted–April 2001 through November 2001–and that time frame would not impact the viability of any paycheck Plaintiffs received.

suit where employee alleged employer gave false explanation for his dismissal). The Court finds that equitable tolling applies to toll the statute of limitations during the three months of alleged deception regarding the longevity correction.

Applying equitable tolling to the three month period from late June of 2004 through September of 2004,[6] the paychecks received by Plaintiffs in the three months prior to June of 2004 become actionable. Thus, while equitable tolling is insufficient to bring the initial discovery of the paycheck discrimination into the statute of limitations period, it does allow for Plaintiffs to recover for discriminatory paychecks received from March 23, 2004 to the present.

## B.    PHRA Claims

Defendants argue that Plaintiffs' PHRA claims are limited to those salary decisions made within 180 days of the filing of their complaint with the PHRC, in this case, October 14, 2004. Initially, Defendants argued that the Supreme Court's holding in Ledbetter required this Court to find that the statute of limitations began to run with each pay-setting decision rather than with each paycheck or under a continuing violation theory. Now that Ledbetter has been overruled by the FPA's explicit change to the language of Title VII, Defendants argue that the different wording in the two statutes implies that the statutes should be interpreted differently, with the PHRA nonetheless having the same interpretation it would have had under Ledbetter. Plaintiffs argue that the FPA applies to the PHRA, as does the discovery rule and equitable tolling. In the alternative, Plaintiffs argue that the single filing rule allows them to use Joan Summy-Long's administrative filing date to expand the reach of their recovery.

---

[6]The Court could not discern the particular date in September on which Plaintiffs learned a longevity correction would not be made. Accordingly, the Court assumes September 23, 2004 for ease of calculation in this case. (Doc. No. 37-3 at 70.)

The Third Circuit has held that the PHRA, 43 Pa. Cons. Stat. Ann. §§ 951 *et seq*., "is to be treated as identical to federal anti-discrimination laws except where there is something specifically different in its language requiring that it be treated differently." Fogleman v. Mercy Hosp. Inc., 283 F.3d 561, 567 (3d Cir. 2002). Prior to both the Supreme Court's holding in Ledbetter and the enactment of the FPA, employer liability under the PHRA was consistent with liability under Title VII. See Knabe v. Boury Corp., 114 F.3d 407, 410 (3d Cir. 1997) ("Employer liability under the Pennsylvania Human Relations Act follows the standards set out for employer liability under Title VII."). Defendant makes no compelling argument to change the traditional that the PHRA follows the standards set out under Title VII.

Because Congress' clear intent with the FPA was to "restore the law that was in place prior to the Ledbetter decision," Mikula, No. 07-4023 at 10, the holding in Ledbetter no longer applies to Title VII cases. As the reasoning in Ledbetter no longer applies even to Title VII cases, the Court declines to apply it to a different statute, the PHRA. Moreover, the Third Circuit Court of Appeals has stated that the interpretation of Title VII prior to the FPA is the same as the interpretation of Title VII after the FPA; either way each paycheck received pursuant to a discriminatory pay structure is independently actionable, and the only inconsistency was the Supreme Court's ruling in Ledbetter. Id. at 12 (citing Hildebrandt v. Illinois Dep't of Natural Res., 347 F.3d 1014, 1027 (7th Cir. 2003)). Because the interpretation of Title VII has not changed, the Court need not engage in discussion of whether the PHRA language is sufficiently similar to Title VII's new language to justify the application of a new standard. Continuing to interpret the PHRA by referring to the standards set forth in Title VII would neither upset PHRA case law nor the general rule that Title VII case law informs the PHRA. Therefore, the Court

20

concludes that each paycheck issued pursuant to a discriminatory pay scheme is independently actionable under the PHRA.

Accordingly, Plaintiffs are entitled to seek recovery under the PHRA for each paycheck received within the statute of limitations period, on or after October 14, 2004. The discovery rule and equitable tolling do not bear on this claim because the three-month tolling period from June 23, 2004 to September 23, 2004 does not suffice to bring any additional paychecks within the limitations period.

### 1.     Single filing rule

Plaintiffs argue in the alternative that claims occurring prior to the limitations period are not barred because of the single filing rule. The single filing rule is a judge-made exception to the administrative exhaustion requirement. Ruehl v. Viacom, Inc., 500 F.3d 375, 385 (3d Cir. 2007). It allows for Plaintiffs who did not timely file an administrative claim to "piggyback" on the administrative filings of another plaintiff if that plaintiff's administrative filings alleged class-wide discrimination sufficient to put the employer on notice of the non-exhausted claims and to encourage meaningful conciliation. Id., at 386-87. Yet, the Third Circuit has only applied the single filing rule to class action contexts. In Ruehl, the court emphasized the importance of the class certification process to the single filing rule, "because that process ensures notice and possible conciliation of each class member's claims." Id. at 387. The court went on to explain that the single-filing rule does not apply when a class has been decertified because those goals are no longer served. Id. at 388. Given this guidance, the Court is unwilling to extend the single filing rule outside the class action context. Although there are multiple Plaintiffs involved in this suit, Plaintiffs have not alleged that this is a class action and have not attempted to certify it as

21

such. Moreover, Plaintiffs cite to no case where the single filing rule has been applied outside the context of a class or collective action.

## C.    Title IX, § 1983, § 1985

Since the time of filing this motion for summary judgment, the Court has dismissed Plaintiffs' §§ 1983 and 1985 claims, however, the Title IX claim remains for the Court's consideration. Both parties agree that Title IX requires a claim to be filed within two years of the discriminatory action. See Bougher v. University of Pittsburgh, 882 F.2d 74, 77-80 (3d Cir. 1989). The parties also agree that Plaintiffs' pay discrimination claim brought under Title IX should borrow from Title VII case law.[7] (Doc. No. 30 at 20, Doc. No. 35 at 22.) The parties disagree, however, with the post-Ledbetter interpretation of Title VII, which leads to their different conclusions under Title IX.

Defendants argue that because the statutory language of the Fair Pay Act does not change Title IX, Plaintiffs can only recover under it for claims that would have been allowable under Title VII prior to Ledbetter or the Fair Pay Act. Defendants then put forth the same arguments

---

[7] Because this is not in dispute, the Court does not consider whether Title IX necessarily borrows from Title VII for pay discrimination claims. See e.g., Murray v. New York University College of Dentistry, 57 F.3d 243 (2d Cir. 1995) ("In reviewing claims of discrimination brought under Title IX by employees, whether for sexual harassment or retaliation, courts have generally adopted the same legal standards that are applied to such claims under Title VII."); Mabry v. State Bd. of Cmty Colls & Occupational Educ., 813 F.2d 311, 315 n. 6 (10th Cir. 1987) ("Because Title VII prohibits the identical conduct prohibited by Title IX, i.e., sex discrimination, we regard it as the most appropriate analogue when defining Title IX's substantive standards . . . ."); Title IX, Education Amendments Act of 1972, Pub. L. No. 92-318, 86 Stat. 253 (1972) ("Title VII . . . specifically excludes educational institutions from its terms. [Title IX] would remove that exemption and bring those in education under the equal employment provision."). But see Smith v. Metropolitan School Dist. Perry Twp., 128 F.3d 1014, 1023 (7th Cir. 1997) (discussing similarities and differences between Title VII and Title IX and holding that Title VII's agency principles do not apply to Title IX).

they made with regard to the PHRA—that Title VII case law prior to Ledbetter only allows Plaintiffs to recover for discriminatory pay decisions made within the statute of limitations period. Plaintiffs, on the other hand, argue that by virtue of the continuing violations theory, Title VII case law prior to Ledbetter allows them to recover for all paychecks dating back to the discriminatory pay decision provided that at least one paycheck is received during the limitations period.

The Court agrees with Defendants that the FPA did not change the wording of Title IX, and thus the terms of the Fair Pay Act do not apply to Title IX. Nonetheless, applying the pre-Ledbetter law of Title VII to Title IX yields the same result. The Third Circuit recently clarified that prior to Ledbetter, Title VII case law held that each paycheck received by Plaintiffs during the limitations period was an independently actionable discrimination claim. See Mikula, No. 07-4023 at 10-13 & n.2 ("Morgan . . . specifically consider[ed] equal pay violations by reaffirming the statement that the Court made in Bazemore v. Friday, 478 U.S. 385 (1986)—that each discriminatory paycheck was a separate discriminatory act that could give rise to a Title VII action."). Therefore, the Court finds that each paycheck received by Plaintiffs that reflects a discriminatory employment decision constitutes a new, actionable adverse employment action. As with Part B, application of the discovery rule and equitable tolling do not bring the accrual of prior discriminatory paychecks into Title IX two-year statute of limitations period. Accordingly, Plaintiffs may recover on their Title IX claim for paychecks received on or after April 23, 2005.

**D.     Equal Pay Act**

The Equal Pay Act ("EPA") prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees in such establishment at a rate less

than the rate at which [the employer] pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility." 29 U.S.C. § 206(d). Violations of the EPA are subject to a two-year statute of limitations, unless the violation is shown to be willful, in which case the statute of limitations is extended to three years. 29 U.S.C. § 255; <u>Miller</u>, 977 F.2d at 842. Refreshingly, the parties agree that under the EPA each paycheck issued to the Professors at a lower pay rate than that received by their male colleagues constitutes a new discriminatory action for purposes of EPA accrual. Because Plaintiffs filed suit on April 23, 2007, Defendants argue that, even under the three-year statute of limitations period for willful violations, Plaintiffs cannot recover for paychecks received prior to April 23, 2004. Given the three-year statute of limitations for willful violations of this statute, the three-month equitable tolling period does impact recovery for some paychecks. It extends the recovery period by three months, making the paychecks received on or after January 23, 2004 actionable under the EPA.

### E. PERA

Both parties agree that the statute of limitations for the Pennsylvania Equal Rights Amendment ("PERA") is two years from the date the lawsuit was filed, thus making claims accruing on or after April 23, 2005 timely. Defendants argue that the same reasoning used to advance their arguments under Title IX is applicable to the PERA. Plaintiffs do not disagree. Neither party has found case law to support its position. Therefore, the Court applies the same reasoning it used in consideration of the Title IX claim and finds that Plaintiffs may recover under the PERA for discriminatory paychecks received on or after April 23, 2005.

### III. CONCLUSION

In conclusion, the Court finds that Plaintiffs are barred from recovery under Title VII for any paychecks received prior to March 23, 2004, under PHRA for any paychecks received prior to October 14, 2004, under Title IX for any paychecks received prior to April 23, 2005, under the Equal Pay Act for any paychecks received prior to January 23, 2004, under the Pennsylvania Equal Rights Act for any paychecks received prior to April 23, 2005.

An order consistent with this memorandum follows.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **CARA-LYNNE SCHENGRUND et al.,** | : | |
| **Plaintiffs** | : | **Civil Action No. 4:07-CV-718** |
| | : | |
| **v.** | : | **(Chief Judge Kane)** |
| | : | |
| **THE PENNSYLVANIA STATE** | : | |
| **UNIVERSITY et al.,** | : | |
| **Defendants** | : | |

## <u>ORDER</u>

**AND NOW**, on this 30th day of September 2009, for the reasons set forth in the memorandum accompanying this order, **IT IS HEREBY ORDERED THAT** Defendants' motion for partial summary judgment (Doc. No. 29) is **GRANTED** in part and **DENIED** in part as follows:

1.  Plaintiffs may recover for discriminatory paychecks or actions that accrued on or after March 23, 2004 in their Title VII claim;

2.  Plaintiffs may recover for discriminatory paychecks or actions that accrued on or after October 14, 2004 in their PHRA claim;

3.  Plaintiffs may recover for discriminatory paychecks or actions that accrued on or after April 23, 2005 in their Title IX and PERA claims;

4.  Plaintiffs may recover for discriminatory paychecks that accrued on or after January 23, 2004 in their Equal Pay Act claim;

s/ Yvette Kane
Yvette Kane, Chief Judge
United States District Court
Middle District of Pennsylvania
